Good morning, and may it please the Court, I'm James Laughlin and I represent the appellant Jose Sandoval. With the Court's permission, I'd like to reserve two minutes of my time for rebuttal. The issue in this case is whether the warrantless detention and search of Mr. Sandoval can be justified under the Supreme Court's decision in Illinois v. Wardlow. This case can be distinguished from Wardlow on three grounds. First, Mr. Wardlow engaged in headlong flight in response to seeing the police. He ran, the police saw him run, and he didn't stop running until the police cornered him in an alley. In contrast, Mr. Sandoval never engaged in this type of headlong flight. JUSTICE KENNEDY He did run, though. We have to accept that he ran, right? JOSEPH WARDLOW We do have to accept that, and that's what the government focuses on, but as the government points out, the Court has to focus on the totality of the circumstances. So the government wants to focus on that less than 20-second period where the officer inferred that Mr. Sandoval ran because he was out of range, because he traversed that distance without running, and also because he looked like he had been sweating a little bit. JUSTICE KENNEDY There seems to be some confusion in the record as to how much distance he covered in that 20 seconds. There's some suggestion that it was 100 yards, and there's other suggestions that it was 200 to 300 yards. It seems to make a difference here, doesn't it? JOSEPH WARDLOW I think so, and I agree with Your Honor that there is some confusion there, and I don't know whether I'll be able to shed much light on that confusion. My best understanding of the record is that the higher number was the total distance traversed from the first time the officer saw Mr. Sandoval to the time he caught  JUSTICE ALITO Okay. All right. JOSEPH WARDLOW The shorter distance is the period he was out of sight. JUSTICE ALITO Okay. JOSEPH WARDLOW But again, that's only a very short period of time, and I think that in looking at the totality of the circumstances and judging whether or not Mr. Sandoval engaged in headlong flight, the court has to look at what happened before, what happened after. Under Wardlow, the headlong flight is only significant to the extent it is in response to seeing a police officer. Here, we don't even have, unlike Wardlow, a clear indication that Mr. Sandoval saw the police cruiser coming down the avenue, which was that Mr. Sandoval did see the police cruiser, and that's why he turned into the parking lot to cut through. I think it's significant, though, that the officer said that at that time, when supposedly Mr. Sandoval was reacting to the police cruiser, he didn't turn and run into the parking lot. He turned and walked into the parking lot. And even if we assume that at some point after that, Mr. Sandoval ran for a brief period, the fact that his first response to the police cruiser was not to run but to walk away makes this case, much like this court's recent decision in Marina, which I mentioned in my Rule 28J letter, where the court acknowledged that walking away from the police, even in a high-crime area, is not the type of headlong flight which gives rise to reasonable suspicion. So, again, to... Are you suggesting that there was no reasonable suspicion sufficient to stop him for a curfew issue? No, not at all, Your Honor. So he did have a sufficient basis for stopping him for curfew inquiry? Right, Your Honor. And he had the right to stop him and to ask him, How old are you and can I see some identification? And I think the government acknowledges that the issue in this case is everything that happened after that point, whether he had a right to ask further questions and detain him further because the initial reason for the stop for the curfew violation had to be limited to what the least intrusive means to satisfy him that there was no such violation. But going back to putting the brief period of the brief less-than-20-second sprint through the parking lot in context, not only was Mr. Sandoval's first reaction to walk into the parking lot, but by the time the officer once again comes around and gets Mr. Sandoval in sight again, he's walking again. The officer admitted that he never saw him running. And what happens is the officer pulls up 20 feet behind Mr. Sandoval. He's still 20 feet away. He doesn't try to run. He doesn't flee at all. He complies with the officer's order to come over to the car. And again, that's much different from the situation in Wardlot. It's clearly different from Wardlot. There's no headlong flight. You keep talking about totality. So what are the other circumstances that were present? He's able to stop him. And so now what is the officer factoring in when he gets him in front of him? Your Honor, I submit that the only thing, the only things that go to the totality of the circumstances, we put aside the curfew violation because that's quickly determined that there's no, that he is not in effect. We've got a proper stop. Right. So at that time, the stop should have ended. The only things that were available to the officer, the only information that officer had to attempt to justify going further, to ask the question about probation, to ask what he was on probation for, to ask, what were you running right now? All the only things he had to go to that next step were, I think this guy ran and this is a high crime area. That's it. And with regard to that second factor, I think it's significant. Hooded sweatshirt. What? And the guy was wearing a hooded sweatshirt, wasn't he? He was, although I'm not sure that the officer pointed to that being any significance of criminal activity. But going to the second factor, the high crime area, again, this is a significant difference from Wardlow. In Wardlow, the officers were going into what they identified clearly as a heavy narcotics trafficking area. They were going in as a raiding party, eight officers and four patrol cars because they expected to find a lot of people there. They expected to find drug dealers, drug customers and drug lookouts. In contrast, in this case, you just have the officer making vague allegations. Well, you know, this is a high drug area. This is a high gang area. And then he kind of throws in other criminal activity. He really never articulated, unlike the officers in Wardlow, a particular criminal activity that he really suspected that Mr. Sandoval was engaged in. What he had at best was a hunch. He saw a Latino man walking down the street at 340 in the morning, and he wanted to check it out. And he did. And we have to accept, because the district court did, we accept that he, even though this guy was wearing a hooded sweatshirt in the middle of the night, he thought he looked under 18. And that's the reason for the initial stop. But the officer was never able to articulate a specific criminal activity that he really suspected. He just had vague notions about there's just general criminal activity going on in this area, so I want to stop this guy. And that's just not enough under the Fourth Amendment. I have nothing further, so unless the Court has any further questions, I'd like to reserve the remainder of my time for rebuttal. Thank you. Good morning, Your Honors, and may it please the Court, Doug McCormick for the Government. There were three significant events during the encounter between Officer Sties and Defendant Jose Sandoval leading up to the discovery of the loaded .38 caliber pistol in the defendant's waistband. The first was the initial stop, which even the defendant has now conceded was proper, under a proper Terry stop, an investigative detention justified by reasonable suspicion. The second was Officer Sties' additional questioning of the defendant after the defendant told him his age. I want to make clear to the Court that the question is not whether the suspicious factors that the Government has identified would have justified the Terry stop in the first place. The Terry stop was justified by the reasonable suspicion of the curfew violation. The question is whether Officer Sties' additional questions were justified by particularized, objective factors. And the Government submits that the answer to that question is yes. Officer Sties had noticed that the defendant was slightly pale and sweating. Based on that observation, and Officer Sties' observation of the distance covered by the defendant, and the amount of time in which he had covered that distance, Officer Sties determined that the defendant had attempted to evade contact with him by running. The District Court, as Your Honor has pointed out, made a factual finding. Well, at that point, Your Honor, the defendant had basically turned the corner and headed up the street. He had, I think, by his account, by his thinking, gotten out of sight of the officer. If the Court looks at the diagram of the street corner at page 66B of the excerpts of record, he was around the corner. He was up the street. Returning to the factors, Officer Sties knew that this was a high crime area, an area of heavy narcotics activity. Officer Sties' testimony on that point was limited. It was not limited to the street, Harvard Boulevard, and the area of the intersection, McFadden Boulevard. It was also a very early hour, 3.40 a.m., an hour of very few legitimate activities in that neighborhood. Under the totality of the circumstances test this Court must apply under Terry and Arvizu, those facts were enough to justify the officer's additional questioning. The additional questioning revealed that this was a defendant, that Mr. Sandoval was on probation for a narcotics offense, that he had terms of search and seizure. Mr. Sandoval also denied that he had been running. The fact that the district court found wasn't candid. What is the significance of the being on probation and under terms? In other words, what are you ascribing to that? That in and of itself is enough justification, or which would seem foreclosed by Moreno? In and of itself it is not, Your Honor, but when it is added to the other circumstances in this case, the government submits that it is reasonable, sufficient to justify a pat-down search for the defendant. The government argues that the pat-down search is justified both as a protective frisk and as a probationary search of a defendant who had terms of search and seizure. At that point now the officer has learned that this is a defendant who has a prior narcotics offense, it is still 3.40 in the morning, it is still a high crime area, and this is a suspect who has attempted to evade contact with the officer. This is a suspect who is now being evasive with the officer about that fact. The defendant then presents Officer Sties with his identification, and Officer Sties sees the address from the defendant's identification is from a neighborhood that the officer knows is a gang neighborhood. At that point the officer pats the defendant down and locates the .38 caliber pistol in his waistband. Officer testified that he did it as a protective frisk and as a search under the terms of the defendant's probation. I'd like to address the defendant's argument based on Ward Law. It is true that the flight here was not of the same type of headlong flight that was present in Ward Law because the officer in fact never saw Mr. Sandoval running. However, Officer Sties concluded that Mr. Sandoval had been running to try to evade him. The district court found that Sandoval had attempted to evade Officer Sties. Ward Law made clear that evasive conduct is a pertinent factor in determining reasonable suspicion. Evasion is evasion. Blatant evasion isn't any less suspicious than subtle evasion. Equally suspicious regardless of what the officer actually saw. If I may also address this court's recent decision in Moreno. Well, when he made that turn, was he heading towards his home? He was headed in the direction of the neighborhood of his home. It's not clear to my recollection. I do believe the defendant lived north of McFadden. I don't remember whether he lived east or west of Harbor. I don't remember the directions in that direction. But yes, I think he was headed in the direction of his home. If I may address the court's recent decision in Moreno. Moreno involved an entirely different level of intrusiveness. The question there was whether the officers had reasonable suspicion to justify an investigatory detention that involved handcuffing the plaintiff and putting him in the backseat of a patrol car. As this court knows, the level of the officer's intrusiveness is one factor in the reasonableness analysis. A less intrusive action requires a less showing of reasonable suspicion. In Moreno, the court said, Here, the intrusiveness of the search and seizure to be weighed are the additional questions the officer asked. Are you on probation and parole? May I see your identification? Why were you running from me? And the government would submit that comparing the reasonableness determination of those questions to the reasonableness determination made in Moreno isn't very helpful because it's just not an apples-to-apples comparison. So what you really have here is the defendant was stopped because the officer thought there was a curfew violation. Then he was satisfied, the officer was, that there was none. And now the defendant is heading towards his home. A fact that the officer did not know, or could not have known. Right, right. Okay. But he cut through this used car lot. He changed direction and went through a commercial development. Yes, I don't think it's a used car lot. Whatever it was, he changed direction. When the officer first saw the defendant, he was walking eastbound on McFadden. As the officer and the defendant passed each other on McFadden, the defendant changed direction to go north through the commercial development. At that point, the officer turned around and turned into the commercial development in an attempt to make contact with the defendant. Couldn't locate him. Pulled all the way through the commercial development, unable to locate him. At that point, got to Harbor Boulevard, looked to his left and saw the defendant 100 yards north on Harbor Boulevard. At that point, the officer turned onto Harbor Boulevard the opposite direction because that's what traffic required and the median required. Made a U-turn, turned around, and stopped the defendant even further up Harbor Boulevard. When he stopped the defendant, his first question was, your age? The defendant said he was 19. The second question was, are you on probation and parole? And it's the government's argument that that question was justified by the hour, the high crime area, and the very significant fact that the officer had concluded at that point, based on the fact that the defendant was pale and sweating, and the distance covered and the amount of time that the defendant had tried to evade him. So he asked the question, are you on probation and parole? The defendant said, I'm on probation. For what? I'm on probation for a narcotics offense. Do you have terms of? I think the officer didn't ask this question. How many stops were there here? One or two? One stop. One stop, which is justified by the question about curfew. What justifies the question about probation? That's just a shot in the dark, isn't it? I mean, he's got lots of questions. He's got little things here and there that suggest that maybe something is going on here. But what justifies the question about probation? Does there have to be any linkage between those facts that make him suspicious of the general activity and the question that he asks him, which is, are you on probation? Submit, Your Honor, that there does not need to be. That's a fairly standard question for police officers to ask someone who they are suspicious of. Are you on probation or parole? And the reason for that is what? Because if they are on probation, then they've got free reign to search them. They would have freer reign to search them, depending on the circumstances that may or may not be present. Well, how is it freer? Well, what is the condition of probation? Can you read it to us? The condition of probation is not of record in this case, Your Honor. There's no evidence of that submitted in the lower court. Most of the time they just talk about being subjected to a search by your probation officer, your parole officer. I don't remember seeing one that says you're subject to search by any police officer. I believe it's a standard term of probation in Orange County that for someone convicted of a narcotics offense, that they may be subject to search by a law enforcement officer at any time or place. But you don't have the language, do you? We do not, because that language was not known to Officer Sties at the time of the encounter. But he's an Orange County guy. Officer Sties is a Santa Ana guy, city of Santa Ana. Well, that's Orange County. Correct. All right. So he should have known. Correct. They know that. He testified that he knew that standard terms of probation for a narcotics offender in Orange County permitted for search and seizure at any time or place by a law enforcement officer. Without reasonable suspicion. Without reasonable suspicion. That's Moreno. That's not the law of the circuit after Moreno. But the government would submit that Officer Sties had reasonable suspicion at the time of the pat-down search, getting back to Judge Bybee's question, which was what were the factors that justified the question about probation or parole. It's the government's argument that Well, he said he took a pat-down search, but what are you justifying that on? That he was a parolee? The pat-down search is justified by two facts, Your Honor. By two methods of analysis, Your Honor. One, as a protective search, which is officer safety, and two, as a search of a probationer. Protective of what? At that point, if the officer doesn't have any other grounds for stopping him, he needs to let him go. It's not likely that he's going to turn around and shoot him at that point. But what is the, I mean, officer safety suggests that he was going to have to engage in some kind of further contact with him, and therefore, for the officer's protection, he wanted to ensure that it wasn't going to turn out badly in the course of talking with him or frisking him or what else. But this is a little bit of a bootstrap to say, Gosh, I'm worried about my safety in this instance, and now I'm going to search you in hopes that I can find something, and then I can take you in. I don't think that's correct, Your Honor, for two reasons. One, this is a very short, condensed period of time. This entire encounter, from the first question, how old are you, to the pat-down search, took no more than about 30 seconds. The questions were, how old are you? Are you on probation or parole? Were you running? Will you step over here and I'll conduct a pat-down search? It was a very brief episode. The officer, and I also should point out, the officer during that point looked at the defendant's identification card and saw the defendant's address and also confirmed the defendant's age. The officer at that point may have done any number of different things. He may have gone back to his patrol car and run the defendant through the computer for any wants or warrants at that point in time, having learned that the defendant was on probation. To do that, the officer has to be certain that this defendant is not a danger. The facts known to the officer at that time suggest to the officer that he has a reasonable belief concern about that issue. He's got a defendant who has a prior narcotics offense. It's 3.40 in the morning. He has a defendant who has been evasive with him, both physically evasive, trying to run, and evasive, basically, about being evasive. Those facts amount, telling the officer, hey, I've got a guy here that I need to have my eye on. And I think it's difficult to tell that patrol officer that it's unreasonable for him to conduct a limited pat-down search to secure his safety during the remainder of the encounter and just while the encounter terminates. And for the... When did he use the computer and the card? The pat-down search resulted in the discovery of the .38 caliber pistol in the defendant's waistband. At that point, the defendant was placed under arrest, and the defendant was placed in the patrol car. So the whole circumstances of the encounter changed during the pat-down search, Your Honor. So we don't know what would have happened next had the pat-down search revealed nothing. Did he testify that he did the pat-down search because he wanted to check the defendant's record using the computer? He testified that he did the pat-down search for officer safety. No, but I mean did he testify that he had in his mind that he was going to go to the computer, and for his safety, then, he gave him a pat-down? He did not. He was not that specific about what he was going to do next. He simply testified. So are you making this up? I'm not making it up, Your Honor. Your Honor, I'm telling you the officer's reasons for, Judge Bridey said, why wasn't the encounter over? I don't think it was in the officer's mind that the encounter was over at that point in time. He had a narcotics offender who was on probation. He was going to check this guy out. He did not testify to that, but I know that to be true. You're assuming that. I know that to be true. You're assuming. I am, Your Honor. You know, I read that $20 and read Giuliani's book. The one thing I learned was, from him, don't assume anything. You ever read that book? I did not, Your Honor. That's probably pretty good advice. The other circumstance that justified the search, Your Honor, is a search justified by reasonable suspicion of a probationer, and there was reasonable suspicion here. We have all the facts that I've just identified to the court that also not only justify it as a protective risk, but also justify it as a search of a probationer. With that, Your Honor, the government submits. Thank you. Thank you. Your Honors, I just wanted to respond to one statement made by the government, and that is the statement that blatant evasion isn't any less suspicious than subtle evasion, and I submit that's just not true. And all nine justices, I think, in the Wardlow decision recognize that to be the case, and it's highlighted in Justice Stevens' opinion, concurring in part and dissenting in part. In the part where he concurs with the majority, they all agree that there are times when evasion in a high-crime area amounts to reasonable suspicion, and they say the devil's in the details. It's what type of evasion under what circumstances. And so I submit that the type of evasion here, the circumstances here, are much different from those in Wardlaw, and given the ones here, there was no reasonable suspicion. Can the officer – you conceded that the officer can stop him and ask him about the curfew violation. Yes, Your Honor. And he can ask him for his ID. Yes, Your Honor. Okay, because that will verify whether he's telling – whether he's correct. Now, the officer, incidentally, is going to learn where the – where Sandoval lives. Yes, Your Honor. Now, can he ask him any of the questions after that? I don't think so, Your Honor. Can he ask him about probation? No, Your Honor. Why not? Because at that point, he has no reasonable suspicion to believe that Mr. Sandoval is engaged in any criminal activity. And at that point, there's no difference to the fact that he's already sitting there talking to Mr. Sandoval from if he had decided to just pull over Mr. Sandoval and ask, hey, are you on probation? Once he satisfies himself that Mr. Sandoval is an adult and not in violation – and not in violation of the curfew ordinance, there is no reasonable suspicion to keep him any further, to ask him any question, nothing. And so I would submit that even asking the question, are you on probation, is not justified at that point. Okay. Unless the Court has any further questions, I would submit. Thank you. Well, can an officer just walk up to someone and say, good morning, and are you on probation? Your Honor, I guess that would depend on the circumstances of the initial stop. If it was a – He's a friendly guy and he wants to know who's on probation. Who is it? Your Honor, I don't want to say categorically that that could never happen. I think it would depend on the circumstances of the stop. Here we clearly have a Terry stop where it isn't in any way a voluntary encounter. He was instructed, Mr. Sandoval was instructed to come over to the police car and engage in this encounter with Mr. Sandoval, and under those circumstances, I don't think he can ask the question absent reasonable suspicion. Do you have a case on that? No, Your Honor, other than the ones that I've cited in the briefs which talk about how the Terry stop must be limited to the specific purpose for the initial stop and can only be expanded if there is reasonable suspicion based on additional factors that come up in the stop to continue. Do you know what the conditions of his probation were, the wording? No, Your Honor, and as the government acknowledges, they never put evidence of that into the record below, which I think is fatal to their attempt to justify this as a probation search. And as the court noted in both the Crawford decision and the Marino decision, the language varies even within California from county to county and certainly over time. So it is significant. I don't think they can't just say that in California somebody has a probation condition, we can search them any time. I think that it was incumbent upon them to put some evidence of the language into the record, and they didn't do that. So I don't know, Your Honor, and neither does the government. Thank you. Thank you. The matter is submitted. We're going to take a short break. We'll be back to pick up. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Hi, how are you? Just fine, how are you? Good. A long time ago when you and Will Marsalak were presenting at a Republican meeting. Yeah, I recall that.  You were there, and Tom Holcomb was there. Yeah, and Tom Holcomb was there. I don't know how to do that. Okay. I'll do my level best to keep you busy. All right. We appreciate that. Well, you know, the problem is you're a particular client, right? You've done exclusion. You've done the whole thing. The problem now is that you have one of the problems. Pardon me. Yeah. Okay. All right. Thank you.       I have some questions. Um, I'd like to ask a question on the, uh, the picture of the participants. Yes. Would you like to stay... Can you go ahead and set up, please? Right. Thank you. Can I tell you I want to reserve time or should I ask a question? Um, you can ask the court, but you're responsible for keeping time. Oh, when does the yellow light go on? Is that... Uh, it's going to be an argument at five minutes. Okay. I don't want to hear any questions about these things. You just don't know insurance companies very well, I think you're going to hear about that. No. I hope it's not an issue. I figured you'd be harder to... Maybe not. The same reason that you do. No. I didn't... No. No. No, it's not an issue. No, it's not.    I'm just saying. I'm just saying. I'm just saying. I'm just saying. I'm just saying. I'm just saying. I'm just saying. Why not? Why not? Why so many trees? because number
judges: Pregerson, Fisher, Bybee